LUITPOLD PHARMACEUTICALS, INC., Plaintiff–Counter–Defendant–Appellant–Cross–Appellee,

v.

ED. GEISTLICH SÖHNE A.G. FÜR CHEMISCHE INDUSTRIE, Defendant–Counterclaimant–Appellee–Cross–Appellant,

**Osteomedical Ltd., Defendant–Appellee.***

**Docket Nos. 13–1872–CV, 13–1934–CV XAP.**

United States Court of Appeals, Second Circuit.

Argued: June 25, 2014.

Decided: April 10, 2015.

* The Clerk of Court is respectfully directed to amend the official caption to conform with the above.

Hunter T. Carter (Mark Bloom, Jennifer Bougher, Jeff Leung, and Martin Cunniff, on the brief), Arent Fox LLP, New York, New York and Washington, D.C., for Luitpold Pharmaceuticals, Inc.

Joseph W. Hammell (David Y. Trevor, Shari L.J. Aberle, Erin P. Davenport, and Christopher G. Karagheuzoff, on the brief), Dorsey & Whitney LLP, Minneapolis, Minnesota, and New York, New York, for Ed. Geistlich Söhne A.G. Für Chemische Industrie and Osteomedical Ltd.

Before: CABRANES, CARNEY, and DRONEY, Circuit Judges.

SUSAN L. CARNEY, Circuit Judge:

In this commercial contract dispute, Plaintiff–Counter–Defendant Luitpold Pharmaceuticals, Inc. ("Luitpold") appeals from an April 17, 2013 judgment of the United States District Court for the Southern District of New York (Katherine B.

Forrest, *Judge* ) to the extent that it made final (1) the court's dismissal, under Rule 12(b)(6) of Civil Procedure, of certain of Luitpold's claims, and (2) the court's grant of summary judgment to Defendant–Counterclaimant Ed. Geistlich Söhne A.G. Für Chemische Industrie ("Geistlich") and Defendant Osteomedical Ltd. ("Osteomedical") on Luitpold's remaining claims. Geistlich cross-appeals, challenging the court's grant of summary judgment to Luitpold on Geistlich's counterclaims.

Because we conclude that the District Court erred in its decisions on the motions to dismiss and for summary judgment, we VACATE and REMAND.

## BACKGROUND

Many of the facts are not in dispute; we flag those that are.

Luitpold is a New York corporation engaged in the development and marketing of an array of drugs and medical devices, including dental implant products. Geistlich is a Swiss chemical and pharmaceutical corporation that develops and manufactures various dental products. Osteomedical is an Irish corporation and a Geistlich affiliate. Osteomedical owned the patents and trademarks for the two groups of dental products at issue in this case—namely, Bio–Oss, Bio–Oss Collagen, and Bio–Tape (collectively, the "Bio–Oss Products"), and Bio–Gide, Bio–Gide Perio, and Bio–Gide Comp. (collectively, the "Bio–Gide Products"). Osteomedical has since transferred those assets to Geistlich. The Bio–Oss and Bio–Gide Products are used to aid bone and tissue growth in dental patients following tooth removal or other dental procedures.

### A. Agreements Among the Parties and Geistlich's "Termination Notice"

In the early 1990s, following several failed attempts to market its Bio–Oss Products in the United States through other companies, Geistlich engaged Luitpold in negotiations regarding a potential collaboration. In March 1994, the parties entered into interdependent commercial and license agreements (respectively, the "Commercial Agreement" and the "1994 License Agreement") that established a distribution relationship among Luitpold, Geistlich, and Osteomedical for the sale of Geistlich's dental products throughout the United States and Canada and their territories.

In the Commercial Agreement, Geistlich agreed, among other things, to supply Luitpold with all of Luitpold's requirements for the Bio–Oss Products and to aid Luitpold in the marketing and distribution of those products in the covered territory. *See* Commercial Agreement ¶ 2.01. In exchange, Luitpold agreed to purchase from Geistlich—at a price equal to a fixed percentage of Luitpold's "net sales"—its requirements for the Bio–Oss Products, and to use its "best efforts" to enter and develop markets in those products within the covered territory. *See id.* ¶¶ 2.02–.03, 7.01. Luitpold also agreed to pay Geistlich a $15 million fee. *See id.* ¶ 6.01.

In the 1994 License Agreement, Osteomedical—which then held the patent and trademark rights in the Bio–Oss Products—granted Luitpold (1) "an exclusive, non-transferable license … to market, sell, distribute and use" the Bio–Oss Products for covered uses in the covered territory; (2) "an exclusive, non-transferable license … to use the TRADEMARKS" relating to the Bio–Oss Products in the covered territory "in connection with the [products'] marketing, sale, distribution, and use"; and (3) an "an exclusive, non-transferable license" to use the "Osteomedical" trade name. 1994 License Agreement ¶ 3.02. The agreement emphasized, however, that Osteomedical was "the

exclusive owner of the TRADEMARKS and all of the goodwill thereto, and [that] except for the rights licensed [t]herein, [Osteomedical] ... retain[ed] the full rights to the TRADEMARKS, the goodwill relating thereto and all registrations granted thereon." *Id.* ¶ 6.03. Luitpold agreed to pay Osteomedical a $5 million fee, as well as a royalty equaling a fixed percentage of its net sales for the products, as consideration for the licenses. *See id.* ¶¶ 4.01, 5.01.

Also in March 1994, all three parties signed a letter agreement (the "1994 Letter Agreement") that stated, with respect to the Commercial Agreement and the 1994 License Agreement, that "the rights and obligations set forth in the one agreement cannot be severed or performed separately or apart from those rights and obligations set forth in the other agreement." 1994 Letter Agreement at 1. Thus, under the 1994 Letter Agreement, the breach of either the Commercial Agreement or the 1994 License Agreement would be deemed a breach of the other, and the termination of one would result in the immediate termination of the other. *See id.* at 2.

In the years following their execution of the 1994 Agreements, the parties entered into several additional agreements and amendments to the original agreements. In 1996, for example, Geistlich and Luitpold entered into an Exclusive Distribution Agreement under which Luitpold received from Geistlich the exclusive right to market, distribute, and sell certain Geistlich Bio–Oss products in additional territory— certain countries in Central and South America—and Luitpold agreed not to sell any identical or similar products in that territory. Also in 1996, Geistlich and Luitpold amended the Commercial Agreement to include Mexico as covered territory.

Further, in 1998, through another amendment to the Commercial Agreement and the execution of a second license agreement (the "1998 License Agreement"), Geistlich and Osteomedical granted to Luitpold rights relating to Geistlich's Bio–Gide Products. The 1998 License Agreement, with terms parallel to those of the 1994 License Agreement, conferred upon Luitpold the same rights in the Bio–Gide Products as Luitpold held in the Bio–Oss Products. And like the agreements entered in 1994, the 1998 License Agreement was accompanied by a letter agreement (the "1998 Letter Agreement") that provided, among other things, that termination of the Commercial Agreement would result in the immediate termination of the 1998 License Agreement and vice versa. *See* 1998 Letter Agreement at 2. Luitpold agreed to pay Osteomedical a $6 million fee, as well as a royalty, for these additional licenses. *See* 1998 License Agreement ¶¶ 4.01, 5.01.

To carry out its responsibilities under the agreements, and at Geistlich's encouragement, Luitpold in 1994 created a separate division, Osteohealth, under which name it sold and marketed Geistlich products over the next decade and a half. Osteohealth became a market leader in the field of dental implant products within the covered territory, and, through Osteohealth, Luitpold eventually made substantial profits based on the Geistlich relationship. Geistlich calculated that those profits amounted to over $100 million.

On September 13, 2010—a little more than sixteen years after the first agreements were signed—Geistlich, which by then had assumed Osteomedical's rights under the License Agreements, declared its intent to terminate the Commercial Agreement and the 1994 and 1998 License Agreements in a letter to Luitpold that it labeled "Termination Notice." *See* Letter

from Geistlich to Luitpold dated Sept. 13, 2010. In that letter, Geistlich informed Luitpold that it was terminating their distribution relationship, without compensation to Luitpold, as of March 31, 2011—a date that Geistlich later revised to June 30, 2011. Geistlich did not allege any material breach of the parties' agreements; rather, Geistlich declared that the agreements in question had been in effect for a "reasonable" time and that therefore, under New York law, Geistlich could unilaterally terminate them upon reasonable notice given to Luitpold. *Id.* at 1.

### B. District Court Proceedings

On February 1, 2011, Luitpold filed a multi-count Complaint against Geistlich and Osteomedical (together, "Defendants") in the United States District Court for the Southern District of New York, properly invoking that court's diversity jurisdiction. The Complaint sought declaratory relief, specific performance, damages, and pre-judgment attachment of Geistlich patents and trademarks based on Defendants' alleged breach of the various agreements. Count I alleged principally that the notice purporting to effect termination was invalid and that Geistlich had failed to meet its supply obligations under the Commercial Agreement. Counts II and V alleged that Geistlich had repudiated and anticipatorily breached the Commercial Agreement and the 1994 and 1998 License Agreements by delivering the Termination Notice. Counts IV and VI alleged that Geistlich breached the 1994 and 1998 License Agreements by advertising Bio–Oss and Bio–Gide Products in the United States in violation of Luitpold's exclusive rights in the trademarks to those products in that territory. Count VII alleged that Luitpold was entitled to prejudgment attachment of the patents and trademarks at issue based on its claims for breach of the various agreements and the likelihood that it

would succeed on those claims. The parties eventually stipulated to the dismissal, with prejudice, of the remaining counts of the Complaint (Counts III, VIII, and IX), *see* Stipulation Pursuant to F.R.C.P. Rule 41(a)(1), filed Nov. 7, 2012, and these are not at issue in this appeal.

Geistlich and Osteomedical moved in April 2011 to dismiss all counts relevant here. The District Court denied the motion in part, but granted the motion as to Counts IV and VI, concluding that Defendants could not have violated Luitpold's contractual rights relating to the trademarks through direct advertising because Defendants had retained ownership of the trademarks. *See Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie* ("*Luitpold I*"), No. 11 Civ. 681(KBF), 2012 WL 1372160, at *8 (S.D.N.Y. Apr. 17, 2012).

In May 2012, Defendants filed their responsive pleading. In the pleading, Geistlich stated four counterclaims, two of which are relevant here. Count II of the counterclaims alleged that Luitpold breached the Commercial Agreement by failing to pay Geistlich the agreed-upon purchase price. Count III of the counterclaims alleged principally that Luitpold breached the "best efforts" provision in the Commercial Agreement when it acquired the rights to and sold competing products.

In September 2012, following the close of discovery, Defendants moved for summary judgment on Luitpold's remaining claims. Concluding that no reasonable factfinder could find that the Commercial and License Agreements were *not* terminable at will, the District Court in a January 2013 order granted Defendants' motion and dismissed Counts I, II, V, and VII of Luitpold's Complaint. The court reasoned that each of those counts rested on the premise—mistaken, in the court's

view—that Geistlich had breached the agreements because its Termination Notice was invalid. *See Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie ("Luitpold II")*, No. 11 Civ. 681(KBF), 2013 WL 208908, at *5–11 (S.D.N.Y. Jan. 15, 2013).

In February 2013, after the District Court dismissed without prejudice Geistlich's other counterclaims at Geistlich's request, Luitpold and Geistlich filed cross-motions for summary judgment on Counts II (the purchase price counterclaim) and III (the "best efforts" counterclaim). On both counts, the District Court denied Geistlich's motion and granted summary judgment to Luitpold. *See Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie ("Luitpold III")*, No. 11 Civ. 681(KBF), 2013 WL 1651624, at *8–10 (S.D.N.Y. Apr. 15, 2013). These rulings drew the litigation to a close in the district court, with no party recovering damages or other relief on any claim or counterclaim.

Following entry of final judgment in April 2013, Luitpold timely appealed. Geistlich timely cross-appealed.

## DISCUSSION

### A. Dismissal of Counts IV and VI of the Complaint

■ We review a district court's grant of a motion to dismiss under Rule 12(b)(6) *de novo*, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. *Cnty. of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 (2d Cir.2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation

marks omitted). In our evaluation of the adequacy of a complaint, we consider as part of the complaint any written instrument attached as an exhibit to the complaint. *See* Fed.R.Civ.P. 10(c).

The 1994 and 1998 License Agreements, each attached as an exhibit to the Complaint, grant to Luitpold, among other things, "an exclusive . . . license . . . to use the TRADEMARKS in the TERRITORY in connection with the marketing, sale, distribution, and use" of the Bio–Oss and Bio–Gide Products in their respective fields of use. 1994 and 1998 License Agreements ¶ 3.02(b). In Counts IV and VI of its Complaint, Luitpold alleged that Geistlich breached those agreements by using the BIO–OSS and BIO–GIDE marks (among the trademarks covered by the License Agreements) to advertise products Geistlich called "Geistlich Bio–Oss" and "Geistlich Bio–Gide" within the United States. *See* Compl. ¶¶ 92, 107. Luitpold alleged that this behavior began even before Geistlich sent its Termination Notice. *See id.* ¶¶ 93, 108.

The District Court dismissed Counts IV and VI on the ground that the License Agreements did not "grant[ ] plaintiff exclusive rights as against Geistlich." *Luitpold I*, 2012 WL 1372160, at *8. The court focused on paragraphs 6.01 to 6.04 of the respective agreements, and concluded that "[t]here is no doubt . . . that Geistlich retains the entire, right, title, and interest in and to the trademarks." *Id.* Paragraph 6.01 provides that "the entire right, title and interest in and to [the] TRADEMARKS shall remain the property of LICENSOR during the term hereof." 1994 and 1998 License Agreements ¶ 6.01.

On appeal, Luitpold contends that the District Court overlooked language in the agreements demonstrating that Luitpold's rights to use the relevant trademarks in the covered territory were exclusive even

as to Geistlich. Luitpold points in particular to paragraph 6.03 of the respective License Agreements, which provides in relevant part:

> LICENSEE agrees that LICENSOR is the exclusive owner of the TRADEMARKS and all of the goodwill thereto, and *except for the rights licensed herein,* LICENSOR shall retain the full rights to the TRADEMARKS, the goodwill relating thereto and all registrations granted thereon.

1994 and 1998 License Agreements ¶ 6.03 (emphasis added).

██ On a motion to dismiss a breach of contract claim, "we should resolve any contractual ambiguities in favor of the plaintiff." *Subaru Distribs. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 122 (2d Cir.2005). Particularly in light of the carve-out expressed in paragraph 6.03, the agreements here were at the very least ambiguous with respect to whether Luitpold's rights to use the trademarks were exclusive of Geistlich's notwithstanding Geistlich's retention of title to them: One could reasonably read the agreements to mean that the parties did not agree to preserve for Geistlich the right to use the BIO–OSS and BIO–GIDE marks in the United States and other covered territory during the license term.

██ Defendants offer no persuasive reason to conclude otherwise. According to Defendants, Geistlich's retained ownership rights in the trademarks rendered Luitpold's license in the marks necessarily nonexclusive as to Geistlich. But a licensor can maintain its ownership of a trademark while granting a license that is exclusive even as to the licensor. *See* 3 McCarthy on Trademarks and Unfair Competition § 18.44.50 (4th ed. 2015) ("If the license is exclusive to a licensee, then the licensor's own use in conflict with the licensed use can be a breach of contract because it is inconsistent with the licensee's exclusive right to use."); *cf. Davis v. Blige,* 505 F.3d 90, 99–100 (2d Cir.2007) (observing that "exclusive licenses . . . grant to the licensee the exclusive right—superior even to copyright owners' rights—to use the copyrighted material in a manner as specified by the license agreement").

Defendants' further argument—that the District Court's dismissal of Counts IV and VI should be affirmed on the alternative ground that Luitpold has failed adequately to plead damages—is no more persuasive. Luitpold alleges in its Complaint that Geistlich's advertisement in the United States of "products [Geistlich] calls 'Geistlich Bio–Oss' and 'Geistlich Bio–Gide'" "has caused Luitpold to suffer damages and immeasurable harm to its goodwill." Compl. ¶¶ 53, 92, 107. According to Luitpold, "[f]rom September 1994 to September 2010, Luitpold . . . spent over $60 million dollars *in an effort to build up Osteohealth's association with the licensed products,* including," among other things, "updating the product marketing materials with new clinical information, conducting training sessions for the sales team on this new clinical information, securing and maintaining sponsorships, and cultivating key opinion leader relationships." Compl. ¶ 46 (emphasis added). And Luitpold alleges that it paid $11 million in fees for the licenses under the 1994 and 1998 License Agreements. *See* Compl. ¶¶ 21, 28. Defendants contend that Luitpold's damages claim is implausible because Luitpold could not have been harmed by Geistlich's advertising of products for which Luitpold was the exclusive distributor. This ignores, however, that not all advertising is beneficial. It is certainly plausible that Geistlich's advertising of Bio–Oss and Bio–Gide Products as "Geistlich" products caused Luitpold to suffer damage, including to its goodwill, by undermining the

products' association with Luitpold's Osteohealth brand. *See, e.g., Borne Chem. Co. v. Dictrow,* 85 A.D.2d 646, 445 N.Y.S.2d 406, 413 (2d Dep't 1981) (explaining that a court may order damages relating to wrongful diversion of goodwill or competition in violation of a restrictive covenant). Further, even if Luitpold's allegations of substantial damages were, as Defendants argue, too "speculative" to support its claims, Luitpold would have plausible claims for nominal damages. *See Ely–Cruikshank Co. v. Bank of Montreal,* 81 N.Y.2d 399, 402, 599 N.Y.S.2d 501, 615 N.E.2d 985 (1993) ("[N]ominal damages are always available in breach of contract actions. . . ." (internal quotation marks omitted)); *cf. Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977) (explaining that, under New York law, "[w]hen the existence of damage is uncertain or speculative, the plaintiff is limited to the recovery of nominal damages").

Luitpold has thus plausibly alleged breaches of contract by Geistlich based on Geistlich's use of the BIO–OSS and BIO–GIDE trademarks in violation of Luitpold's exclusive licenses. The District Court's dismissal of Counts IV and VI was therefore in error, and those counts must be reinstated as to Geistlich and Osteomedical.[1]

## B. Summary Judgment on Luitpold's Remaining Claims

■ We review *de novo* a district court's summary judgment grant, applying the same standard as the district court. *See Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 145 (2d Cir.2002). Summary judgment in favor of the moving party is proper "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding whether there exists a genuine dispute as to any material fact, the court must construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in the nonmoving party's favor. *Rubens v. Mason,* 527 F.3d 252, 254 (2d Cir.2008).

■ Under New York law—which governs here, according to the agreements' terms—"a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *MHR Capital Partners LP v. Presstek, Inc.,* 12 N.Y.3d 640, 645, 884 N.Y.S.2d 211, 912 N.E.2d 43 (2009). In construing a contract, a court should read the contract as a whole, *see Westmoreland Coal Co. v. Entech, Inc.,* 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 794 N.E.2d 667 (2003), and avoid any interpretation that would render a contractual provision without force and effect, *see Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.,* 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984); *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 176 N.E.2d 37 (1961). Only when a court finds ambiguity in the parties' written agreement may it look to extrinsic evidence to discern the parties' intent. *See Schron v. Troutman Sanders LLP,* 20 N.Y.3d 430, 436, 963 N.Y.S.2d 613, 986 N.E.2d 430 (2013). A contract is ambiguous when "[r]easonable minds could differ" as to its meaning. *Van Wagner Adver. Corp. v. S & M Enters.,* 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756 (1986).

■ Because facial ambiguity in a contract will require the factfinder to ex-

---

1. Although the briefs on appeal and the allegations in the Complaint focus on Geistlich's conduct, Luitpold appealed from the judgment to the extent that it granted the motion to dismiss of both Defendants. We leave it to the parties and the District Court on remand to address Osteomedical's status as a defendant.

amine extrinsic evidence to determine the contract's effect, and because such extrinsic evidence is most often mixed, a court generally will not grant summary judgment on a contract claim when the operative language is ambiguous. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir.2000). No genuine dispute will exist, however, where "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary," or "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Id.* at 158 (internal quotation marks and brackets omitted). Whether a contract is ambiguous in the first place presents a question of law. *See id.*; *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002).

On Defendants' motion for summary judgment following the close of discovery, the District Court dismissed the remaining counts of Luitpold's Complaint. Each of Luitpold's remaining claims depended on the premise that the Commercial and License Agreements were not terminable at will, and that Geistlich's September 2010 Termination Notice constituted a breach of those agreements. Since, under the Letter Agreements, termination of the Commercial Agreement would result in the termination of the License Agreements and vice versa, a provision rendering either the Commercial Agreement or the License Agreements terminable at will would have rendered all agreements terminable at will.

Article V of the Commercial Agreement provides that the agreement's term "shall continue until such time as [the agreement] is terminated pursuant to the provisions of this ARTICLE V and/or ARTICLE IX hereof." Commercial Agreement ¶ 5.01. Paragraph 5.02 of Article V expressly gives Geistlich a "right to terminate" when Luitpold fails to meet certain specified sales targets. *See id.* ¶ 5.02. Article IX of the Commercial Agreement is entitled "Termination." Because it is critical to our reading of the agreement, we set it forth here at some length. It provides in relevant part as follows:

9.01 Subject to all of the provisions set forth in this COMMERCIAL AGREEMENT, this COMMERCIAL AGREEMENT may be terminated by mutual consent of the parties in writing at any time.

9.02 In the event that any of the terms or provisions hereof are incurably breached, the non-breaching party may immediately terminate this COMMERCIAL AGREEMENT by written notice. For purposes of this COMMERCIAL AGREEMENT, an "incurable" breach shall be committed when,

  (a) [a party enters into bankruptcy proceedings,]

  (b) [Luitpold fails to meet the performance standards outlined in paragraph 5.02,] or

  (c) [Luitpold fails to make payments when due unless otherwise specifically excused].

9.03 In the event that this COMMERCIAL AGREEMENT is terminated for any reason whatsoever, except as specifically provided otherwise in this COMMERCIAL AGREEMENT, the duties and obligations of the breaching party which have accrued prior to termination shall not be released or discharged by such termination. Further, termination of this COMMERCIAL AGREEMENT for any reason whatsoever shall be ineffective to release or discharge for any reason the continuing obligations hereof,

including but not limited to the obligations of confidentiality.

9.04 It is expressly agreed and understood that except as specifically set forth in Paragraph 9.04(a) below, termination of this COMMERCIAL AGREEMENT for any reason shall not excuse any of the payments contemplated by ... this COMMERCIAL AGREEMENT nor shall termination of this COMMERCIAL AGREEMENT serve as a basis for BUYER obtaining a refund of any of the payments made in accordance with ... this COMMERCIAL AGREEMENT.

    (a) The only circumstances which shall excuse payments not yet made by BUYER ..., or entitle BUYER to a refund ... is GEISTLICH's failure to supply BUYER's requirements of PRODUCT ordered in accordance with the terms and conditions of this COMMERCIAL AGREEMENT: ....

*Id.* ¶¶ 9.01–.04.

Looking to these provisions, the District Court concluded in a January 2013 decision and order that "[t]he Commercial Agreement's language relating to termination is ambiguous." *Luitpold II*, 2013 WL 208908, at \*6. The court acknowledged that paragraphs "9.01 and 9.02 appear to allow both parties to terminate the agreement together upon mutual consent, or either party to terminate the agreement unilaterally upon the other party's 'incurable breach.'" *Id.* But the court found ambiguity in paragraph 9.03, namely, "whether [paragraph] 9.03 ... allows for unilateral termination of the contract for 'any reason whatsoever'—as it says—or whether that [paragraph] equates such termination with a breach of the contract." *Id.* at \*11. The court provided this explanation:

Read with the former provisions, [paragraph] 9.03 could as easily mean: "A termination of this agreement for any reason whatsoever will not discharge a party in breach's existing obligations, except if this agreement provides for different consequences"—an interpretation defendants[ ] would surely prefer—as: "A termination for any reason whatsoever, other than those reasons specifically listed in 9.01 and 9.02 is a breach of this agreement, which will not discharge existing obligations of the breaching party [and indeed, subject the breaching party to liability for breach of contract]"—a reading more in line with Luitpold's theory.

*Luitpold II*, 2013 WL 208908, at \*6.

After examining the evidence proffered by the parties in support of their favored interpretations—principally testimony by Geistlich's President Dr. Peter Geistlich, who negotiated the agreement, on the one hand, and testimony by Luitpold's former Vice President (and current President and Chief Executive Officer) Mary Jane Helenek, who did not directly negotiate the agreement, on the other—the court dismissed Luitpold's evidence as speculative and concluded that it failed to create a genuine dispute as to the parties' intent. *See id.* at \*3–4, \*7–11. Focusing on Dr. Geistlich's testimony that "'the final understanding was that we can understand the termination clause in the sense that we can cancel the contract at any time for any reason,'" the court concluded that "a reasonable factfinder could only find that unilateral termination is permissible." *Id.* at \*7, \*11.

Luitpold argues that this Court should vacate the District Court's grant of summary judgment in favor of Geistlich and Osteomedical. According to Luitpold, the District Court (1) misinterpreted the "survival clause" in paragraph 9.03 of the Com-

mercial Agreement to be ambiguous with respect to whether it granted a unilateral right of termination "for any reason whatsoever"; and (2) usurped the role of the jury by disregarding Luitpold's proffered extrinsic evidence on contractual intent and failing to view the evidence in the light most favorable to Luitpold.

    ■ We agree with Luitpold that the District Court erred in ruling that paragraph 9.03 was ambiguous with regard to whether it confers a right of termination "for any reason." Paragraph 9.03 does not purport to speak to *when* a party is permitted to terminate the contract; rather, it governs a different question: which "duties and obligations of the breaching party" survive termination of the contract. Similarly, paragraph 9.04, which the District Court did not discuss but which contains language echoing· the contested language of paragraph 9.03, also by its terms governs the survival of obligations following the agreement's termination, and contains no language purporting to confer a right of termination.

    To understand when the contract may be terminated, one must look elsewhere: namely, to paragraphs 5.02, 9.01, and 9.02. These provisions expressly give Geistlich a right of termination when Luitpold fails to meet certain sales targets (¶ 5.02); both parties a right of termination upon written mutual consent (¶ 9.01); and either party the right of termination in the case of an "incurable" breach by the other (¶ 9.02). In paragraphs 9.03 and 9.04, the words "for any reason" within the phrases "terminated for any reason whatsoever" and "termination ... for any reason" can be

construed only within the bounds of the concept of termination as expressly defined elsewhere in the agreement, and do not in themselves give rise to separate permissible grounds for termination. The agreement is unambiguous in this respect.[2]

    Hewing to a "cardinal rule" of construction, *Corhill Corp.*, 9 N.Y.2d at 599, 217 N.Y.S.2d 1, 176 N.E.2d 37, this interpretation of paragraphs 9.03 and 9.04 avoids rendering the agreement's other termination provisions superfluous. If either party could terminate the agreement at will, there would be no need for the parties to secure mutual, written consent for termination, *see* Commercial Agreement ¶ 9.01, or to wait until the other· party had "incurably breached" before terminating the agreement, *see id.* ¶ 9.02. Geistlich's special right of termination in cases in which Luitpold failed to meet certain sales targets, *see id.* ¶ 5.02, would be superfluous as well.

    We thus conclude that the Commercial Agreement unambiguously provides no right of unilateral, at-will termination. The District Court erred in concluding to the contrary. The 1994 and 1998 License Agreements—either of whose termination would effect a termination of the Commercial Agreement, according to the 1994 and 1998 Letter. Agreements—are similarly unambiguous in creating no right of unilateral, at-will termination. *See* 1994 and 1998 License Agreements ¶¶ 3.01, 11.01–.03. In light of this analysis of the text of the agreements, we need not decide whether the court erred in its appraisal of the extrinsic evidence of the parties' in-

---

**2.** Notably, even the reading of paragraph 9.03 that the District Court attributed to Defendants—that " '[a] termination of this agreement for any reason whatsoever will not discharge a party in breach's existing obligations, except if this agreement provides for different consequences,' " *see Luitpold II*,

2013 WL 208908, at *6—does not go so far as to provide expressly that either party may terminate the agreement for any reason or for no reason. Consistent with the plain language of· the Commercial Agreement, this reading, too, is silent as to the scope of contemplated and permitted terminations.

tent: That evidence is irrelevant in the face of the agreements' unambiguous language.

■ We note that, in concluding that these contracts provide for no such unilateral rights, we do not adopt the alternative reading identified by the District Court and advocated by Luitpold. At Luitpold's urging, the District Court reasoned that paragraph 9.03 was ambiguous because it might be read to mean: " 'A termination for any reason whatsoever, other than those reasons specifically listed in 9.01 and 9.02 [and, presumably, 5.02,] is a breach of this agreement, which will not discharge existing obligations of the breaching party [and indeed, will subject the breaching party to liability for breach of contract].' " *Luitpold II*, 2013 WL 208908, at *6. But this reading misunderstands the conventional relationship between "termination" and "breach." The terms of a contract should be construed according to their plain meaning, taking into account "the reasonable expectation and purpose of the ordinary business[person], in the factual context in which terms of art and understanding are used." *Uribe v. Merchs. Bank of N.Y.*, 91 N.Y.2d 336, 341, 670 N.Y.S.2d 393, 693 N.E.2d 740 (1998) (internal quotation marks omitted). As the legal term is generally used in a contractual setting, a "termination" is said to "occur[ ] when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach," U.C.C. § 2–106(3) (2012); *see also* Restatement (Second) of Contracts § 283 (1981) cmt. a (quoting U.C.C. § 2–106(3)), or pursuant to a right "accorded to a party to a contract when the other party breaches a duty that arises under the contract," *see* Black's Law Dictionary 1522

(10th ed.2014).[3] Crucially, however, under neither the U.C.C. nor Black's rendering do contract "terminations" include "repudiations." *See* Restatement (Second) of Contracts § 250 ("A repudiation is (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for which renders the obligor unable or apparently unable to perform without such a breach."); *see also id.* § 253 (explaining when a repudiation may be treated as a breach). Against the backdrop of these terms' traditional usage, and in light of the other specific considerations described above, paragraph 9.03 can reasonably be interpreted to mean only that accrued duties and obligations of any breaching party survive termination of the agreement, except as otherwise specifically provided in the agreement.

Defendants urge that even if the Commercial Agreement did not provide for unilateral, at-will termination, we should affirm the grant of summary judgment in their favor because the agreement was of indefinite term and therefore, under New York law, terminable at will after a "reasonable time." Defs.' Confidential Br. 33. Defendants contend, further, that the summary judgment grant can be affirmed on the additional alternative ground that the damages sought by Luitpold—for lost profits—were not contemplated by the parties in the agreement.

■ We may affirm a district court's grant of summary judgment "on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." *See Mauro v. So. New England Telecomms., Inc.*, 208 F.3d 384, 387 n. 2 (2d Cir.2000) (per curiam) (internal quotation marks omitted). Whether to consider

---

**3.** The U.C.C. definition of "termination" includes a carve-out for the act of putting to an end a contract for its breach because the

U.C.C. defines such an act, separately, as a "cancellation." *See* U.C.C. § 2–106(4).

grounds not addressed by the district court is discretionary, however. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP,* 735 F.3d 114, 127 (2d Cir.2013); *No Spray Coalition, Inc. v. City of N.Y.,* 351 F.3d 602, 606 (2d Cir.2003). Because the issues presented by Defendants are multifaceted and may require examination of evidence going to the parties' intent, we ·decline to address them in the first instance. *See, e.g., CILP Assocs.,* 735 F.3d at 127 (remanding where "the ... issue is highly fact-intensive and will depend on an evaluation of expert witness reports and deposition testimony"). We vacate the District Court's grant· of summary judgment in Defendants' favor and remand for its consideration of these issues.[4]

## C. Summary Judgment on Geistlich's Counterclaims

After the District Court disposed of Luitpold's claims, both Luitpold and Geistlich moved for summary judgment on Geistlich's two remaining counterclaims (the others having been dismissed). Count II of the counterclaims alleged that ·Luitpold had breached the Commercial Agreement by failing to pay Geistlich the required· "purchase price" for product purchased under the agreement. Count III also alleged a breach of contract by Luitpold, based on Luitpold's alleged failure to use its "best efforts" to develop markets in the covered territory for Geistlich products, and to execute an agreed-upon business plan. In an April 2013 decision and order, the District Court denied Geistlich's motion for summary judgment and granted Luitpold's motion, ruling that Luitpold had not breached either of these contractual obligations to Geistlich. *See Luitpold ·III,* 2013 WL 1651624, at *10.

On appeal, Geistlich contends that summary judgment should have been granted in its favor on Count II, and that there existed genuine disputes of material fact precluding the grant of summary judgment in Luitpold's favor on both counts. We consider each of the dismissed counterclaims in turn, reviewing the District Court's decisions on summary judgment under the standards described in Part B, above.

### 1. Luitpold's alleged failure to pay the purchase price

Under the pricing formula contained in Article VII of the Commercial Agreement, the purchase price owed by Luitpold to Geistlich on the Bio–Oss Products, and later also on the Bio–Gide Products, was a percentage of Luitpold's "NET SALES" for the products, "unless agreed to otherwise in writing." Commercial Agreement ¶ 7.01, as amended by Feb. 11, 1998 Amendment to Commercial Agreement ¶ 2.11. "NET SALES" were defined under the agreement to mean "gross sales of PRODUCT in the TERRITORY less ALLOWABLE DEDUCTIONS." Commercial Agreement ¶ 1.07. The allowable deductions included, among others, "customary trade and cash discounts actually allowed on PRODUCT sold," "credit for allowances for damaged, outdated or returned PRODUCT," and "government rebates actually paid in conjunction with sales of PRODUCT, if applicable." *Id.* ¶ 1.08(a)-(c). Paragraph 7.02 of the Commercial Agreement provided that "[t]erms of payment shall be net sixty (60) days from the date of shipment." *Id.* ¶ 7.02.

The parties do not. dispute that it would have been impossible for. Luitpold to pay Geistlich the purchase price described in

---

**4.** As with our decision on the appeal from the District Court's decision on Defendants' motion to dismiss, we leave it to the District Court and the parties on remand to address Osteomedical's status as a defendant.

the Commercial Agreement within the 60–day time frame stipulated in the agreement: The purchase price depended on the total allowable deductions on Luitpold's sales, which, the parties agree, could not have been known within 60 days of the product's shipment by Geistlich. Instead, within that 60–day time frame, Luitpold paid to Geistlich the "transfer price" or "ex-factory price" that Luitpold and Geistlich included as an additional term in the written purchase order and confirmation forms used in the transactions. Luitpold never paid Geistlich any additional sum.

In Count II of the counterclaims, Geistlich alleged that Luitpold breached the Commercial Agreement by failing to pay Geistlich the agreed-upon purchase price; Geistlich claimed damages in the amount of Luitpold's underpayment, plus interest as specified in the agreement. *See* Countercl. of Def. Geistlich ("Countercl.") ¶ 34. According to Geistlich, the parties understood that Luitpold would make a "true-up" payment to Geistlich to account for any underpayment for its product after the purchase price was known. *See id.* ¶ 32. For years, the total amount paid by Luitpold under the purchase order and confirmation forms had exceeded the amount Luitpold would have owed under the Commercial Agreement's purchase price term, such that Geistlich benefited from the discrepancy; but in 2006, the balance shifted to favor Luitpold, and by the end of 2011, Luitpold had allegedly underpaid Geistlich by millions of dollars, *see id.*

On the parties' cross-motions for summary judgment, the District Court granted summary judgment in Luitpold's favor on Count II. The court held that "the plain language of the [Commercial] Agreement preclude[d] the Court from implying a true-up provision from the Agreement's silence"; that the "undisputed facts [we]re sufficient to establish that the parties ef-fectively modified the price term of the Agreement" through the written purchase order and confirmation forms; and that, "[n]otwithstanding [a] 'no waiver' provision" in the Commercial Agreement, Geistlich had waived its right to sue for breach on the basis of Luitpold's alleged under-payment because it had "acquiesced" in Luitpold's conduct "for seventeen years." *Luitpold III*, 2013 WL 1651624, at *8–9.

Geistlich contends on appeal that the District Court erred in granting summary judgment in Luitpold's favor, and should instead have granted summary judgment in its favor. We agree with Geistlich that the District Court's grant of summary judgment to Luitpold on Count II was erroneous, but we disagree that summary judgment should have been granted in Geistlich's favor.

■■■ The District Court mistakenly concluded that there existed no genuine dispute as to whether the purchase order and confirmation forms exchanged by the parties constituted written modifications of the purchase price term of the Commercial Agreement. It is true that under paragraph 7.01 of the Commercial Agreement, "purchase price" is calculated as a certain percentage of net sales only if not "agreed to otherwise in writing" by the parties. Commercial Agreement ¶ 7.01. But it is hardly clear that the parties intended for their standard purchase order and confirmation forms to serve as such written modifications of the negotiated purchase price term.

As a preliminary matter and significantly, the forms are ambiguous on their face with respect to whether they constitute modifications of the "purchase price" term of the Commercial Agreement: Luitpold's forms include figures for the "unit price" and "extended price" of the goods, but make no mention of "purchase price" or the Commercial Agreement. Geistlich's

forms refer to "USD/Unit," "Value," "Cost of Goods," and "Gross Value," but, similarly, make no mention of "purchase price" or the Commercial Agreement. Because the forms are ambiguous, summary judgment properly could have been granted in Luitpold's favor only if the evidence presented by the parties was so one-sided that no reasonable jury could have concluded that the forms did not modify the Commercial Agreement's purchase price term, or if Geistlich pointed to no relevant extrinsic evidence supporting its interpretation of the forms. *See Compagnie Financiere,* 232 F.3d at 157–58.

Neither condition was met here. In support of its position that the price paid under the purchase order and confirmation forms was not intended to substitute for the purchase price, Geistlich pointed to, among other things, evidence that the parties retained the Commercial Agreement's characterization of "purchase price" as a percentage of net sales through their three formal amendments to the agreement in 1996, 1998, and 2008. Geistlich also pointed to evidence that even Luitpold executives did not believe that the price paid under the purchase order and confirmation forms substituted for the purchase price owed under the Commercial Agreement. This latter category of evidence included: testimony of Luitpold's Vice President of Finance, Mary Lent, that she maintained a spreadsheet that tracked the difference between the amount due under the Commercial Agreement and the amount paid under the purchase order and confirmation forms; a copy of that spreadsheet; a 2002 letter from Luitpold's Customer Service Senior Manager to Dr. Geistlich explaining that Luitpold had determined, accounting for net sales, that the actual price it had paid for product in 2001 exceeded the parties' agreed-upon price, and requesting a remittance; and a 2006 email chain involving Mary Jane Helenek (by then Luitpold's President and Chief Executive Officer) discussing a possible modification to the purchase order form that might enable Luitpold to avoid being required to pay what the Luitpold executives themselves referred to as a "true-up," since by that time Luitpold (rather than Geistlich) would have owed money under the purchase price term of the Commercial Agreement. Construing the evidence in the light most favorable to Geistlich, a reasonable jury easily could have found that the parties intended for the payments made under the purchase order and confirmation forms to be subject to adjustment once the purchase price described in the Commercial Agreement could be calculated.

The District Court discounted evidence that Luitpold believed a true-up might be necessary on the ground that the Commercial Agreement was unambiguous in making no provision for such a true-up. *See Luitpold III,* 2013 WL 1651624, at *8 n. 7. In our view, the District Court's reasoning in this regard was misguided in at least two respects. First, the court ignored that—regardless of whether the Commercial Agreement envisioned a true-up— Luitpold's subjective belief as to whether a true-up was necessary was relevant to whether Luitpold intended to modify the purchase price provision of the Commercial Agreement through its purchase order forms. A reasonable jury could have concluded that Luitpold's apparent belief that a true-up would be necessary indicated that Luitpold did not intend to modify the purchase price term of the Commercial Agreement through its purchase order forms.

Second, the court erred in concluding that the plain language of the Commercial Agreement precluded the court (and presumably, any factfinder) from identifying a true-up provision implic-

it in the agreement. Apparent internal inconsistencies within a contract can suggest ambiguity, which can then be addressed through extrinsic evidence. *See, e.g., Fed. Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 691 N.Y.S.2d 508, 512 (1st Dep't 1999); *Bianculli v. Bianculli,* 242 A.D.2d 647, 663 N.Y.S.2d 217, 220 (2d Dep't 1997). And where a term " 'may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent,' " it may be treated as implied in the contract and supplied by the court. *In re World Trade Ctr. Disaster Site Litig.,* 754 F.3d 114, 122 (2d Cir.2014) (quoting *Haines v. City of N.Y.,* 41 N.Y.2d 769, 772, 396 N.Y.S.2d 155, 364 N.E.2d 820 (1977)). Here, the requirement under the Commercial Agreement that Luitpold pay Geistlich for Geistlich's product within 60 days of shipment, *see* Commercial Agreement ¶ 7.02, where the agreed-upon purchase price for that product could not be determined within the 60–day time frame, *see id.* ¶¶ 7.01, 1.07–.08, created an ambiguity within the contract as to whether the "payment" due within 60 days of shipment was for the full purchase price or some tentative estimate. Since the apparent inconsistency among its terms rendered the Commercial Agreement ambiguous with respect to the amount and the timing of the payment due, the District Court erred by concluding that the contract, as a matter of law, could not support an implied true-up provision.

■ We cannot accept as an alternative basis for upholding the summary judgment grant in Luitpold's favor the District Court's conclusion that Geistlich waived its right to sue for this alleged breach of contract. A contractual right may be waived if it is "knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104, 817

N.Y.S.2d 606, 850 N.E.2d 653 (2006). But "waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection." *Id.* (internal quotation marks omitted). "[M]ere silence, oversight or thoughtlessness in failing to object" is insufficient to support an inference of waiver. *Courtney–Clarke v. Rizzoli Int'l Publ'ns, Inc.,* 251 A.D.2d 13, 676 N.Y.S.2d 529, 529 (1st Dep't 1998).

There remains a genuine dispute as to whether Geistlich waived its right to sue under the purchase price term of the Commercial Agreement. The Commercial Agreement provides that "no[ ] . . . waiver of any terms or provisions hereof shall be deemed valid unless in writing and signed by the parties signatory hereto." Commercial Agreement ¶ 19.03. On appeal, Luitpold does not argue, and points to no evidence suggesting, that the parties ever waived the purchase price term of the Commercial Agreement in writing. This in itself does not end the inquiry, however, because a so-called "no-waiver" clause may itself be impliedly waived under certain circumstances. *See 510 Joint Venture v. Solcoor, Inc.,* 177 A.D.2d 465, 575 N.Y.S.2d 897, 899 (2d Dep't 1991). But the presence of such a clause means that for summary judgment to have been properly granted in Luitpold's favor on waiver grounds, the evidence, viewed in the light most favorable to Geistlich, must have unequivocally demonstrated not only that the parties intended to waive the purchase price term of the Commercial Agreement, but that they intended for the "no-waiver" clause to have no effect. This was far from the case. Evidence of Geistlich's delay in bringing suit and its failure earlier to notify Luitpold of any breach—the only evidence of waiver to which Luitpold points—easily could be understood to reflect a belief on the part of Geistlich that immediate suit was unnecessary or was

unwarranted because a financial reconciliation would occur eventually. As described above, Geistlich has put forward ample evidence demonstrating that both parties believed that a true-up would be necessary to reconcile the difference between the price Luitpold actually paid for the product and the purchase price Luitpold owed under the Commercial Agreement.

As to Geistlich's further contention that summary judgment should have been granted in its favor on Count II, we disagree. Construing the evidence in the light most favorable to Luitpold, and drawing all reasonable inferences in Luitpold's favor—as we must, on Geistlich's motion— we cannot conclude that a reasonable jury would have been required to find Luitpold liable for breach. The purchase price and due date terms of the Commercial Agreement were inconsistent, and the record contains evidence that Geistlich accepted payment under the terms of the purchase order and confirmation forms, and failed for years to bring suit or complain of underpayment. Together, this evidence creates genuine disputes—both as to whether Luitpold was obligated to pay the purchase price described in the Commercial Agreement, and as to whether Geistlich waived its right to sue under the purchase price term.

## 2. Luitpold's alleged failure to use its best efforts

Under paragraph 2.02 of the Commercial Agreement, Luitpold "agree[d] that it w[ould] use its best efforts to expeditiously enter and develop markets in and to the PRODUCT for the FIELD OF USE in the TERRITORY and w[ould] use its best

efforts to commence execution of the business plan ... within forty five (45) days after signing th[e] COMMERCIAL AGREEMENT and thereafter w[ould] use its best efforts to continue the execution of the business plan." Commercial Agreement ¶ 2.02. In Count III of the counterclaims, Geistlich alleged that Luitpold breached this "best efforts" obligation when it entered into an agreement with a third party to sell a product called "GEM21S" that aimed to do what Bio–Oss was designed to accomplish; promoted GEM21S to Geistlich customers; and ceased to use appropriate marketing methods to promote Geistlich products. *See* Countercl. ¶¶ 35–45.[5]

The District Court, highlighting record evidence that Geistlich had been aware of Luitpold's efforts to market and sell GEM21S by December 2003 and had communicated its concerns to Luitpold in June 2004, concluded that Luitpold was entitled to summary judgment on Count III on two grounds. The court held, first, that "the doctrine of election of remedies preclude[d] such a belated claim"; and second, that "[a]t best, ... [Geistlich's] claim[ ] expired by June 2010." *Luitpold III*, 2013 WL 1651624, at *9–10.

■■■■ The doctrine of election of remedies generally prevents a party that has chosen to assert one of two inconsistent rights from later seeking to vindicate the alternative right. *See Clark v. Kirby*, 243 N.Y. 295, 303, 153 N.E. 79 (1926); *Schenck v. State Line Tel. Co.*, 238 N.Y. 308, 311, 144 N.E. 592 (1924); *331 E. 14th St. LLC v. 331 East Corp.*, 293 A.D.2d 361,

---

5. Count III also alleged that Luitpold breached its best efforts obligation through the sale of another competing product beginning in January 2012. *See* Countercl. ¶ 53. The District Court noted that this conduct post-dated the termination of the agreement and thus declined to take it into account. *See Luitpold III*, 2013 WL 1651624, at *6 n. 4. On appeal, Geistlich does not challenge this decision and focuses instead on Luitpold's conduct relating to GEM21S.

740 N.Y.S.2d 327, 328 (1st Dep't 2002). The District Court interpreted the doctrine to preclude a party from suing for damages based on a breach once that party, with knowledge of the breach, has continued to accept performance from the breaching party. *See Luitpold III*, 2013 WL 1651624, at *10. But New York law does not treat as inconsistent the right to continue to perform and to accept performance under a contract (on the one hand) and the right to sue for damages based on a breach (on the other): "A party to an agreement [that] believes [the agreement] has been breached may elect to continue to perform the agreement" and later sue for the alleged breach, so long as that party does not waive its right to sue by, *inter alia*, failing timely to notify its counterparty of the breach. *Capital Med. Sys. Inc. v. Fuji Med. Sys., U.S.A. Inc.*, 239 A.D.2d 743, 658 N.Y.S.2d 475, 478 (3d Dep't 1997); *see also Syracuse Orthopedic Specialists, P.C. v. Hootnick*, 42 A.D.3d 890, 839 N.Y.S.2d 897, 900 (4th Dep't 2007) (quoting *Capital Med. Sys. Inc.*). Geistlich's decision not to terminate the agreement after first discovering Luitpold's breach thus did not in itself bar Geistlich, under the election of remedies doctrine, from suing for damages based on that breach. Further, in light of evidence of communications from Geistlich to Luitpold raising concerns with Luitpold's marketing and sale of GEM21S, there remains a genuine dispute as to whether Geistlich provided timely notice of any breach. As a result, the District Court's grant of summary judgment to Luitpold on Geistlich's best efforts claim cannot be affirmed on the basis of waiver, either.

The District Court's conclusion that summary judgment in Luitpold's favor was warranted on timeliness grounds was also erroneous. We accept the court's preliminary determination that, to have been timely, the best efforts claim would have

had to be based on conduct occurring in or after September 2004, *see Luitpold III*, 2013 WL 1651624, at *10. Luitpold does not challenge the court's reasoning that a "tolling agreement" described by the parties in their pleadings, and entered as early as September 2010, *see* Compl. ¶ 39; Defs.' Answer ¶ 39, would have suspended the running of any statutes of limitations until Geistlich's counterclaims were filed, and that New York's six-year statute of limitations for breach of contract actions, *see* N.Y. C.P.L.R. 213, governs. *See* Luitpold's Corrected Confidential Reply Br. 54. But we disagree with the District Court's conclusion that Geistlich's claim was time-barred because it was "based on Luitpold's decision to begin marketing GEM21S," *Luitpold III*, 2013 WL 1651624, at *10.

Viewing the evidence in the light most favorable to Geistlich, and drawing all reasonable inferences in Geistlich's favor, there remains a genuine dispute as to whether Geistlich's claim accrued by September 2004. Geistlich's claim of breach was actually based on Luitpold's alleged failure to "exercise its 'best efforts' to develop markets in and to GEISTLICH products and to execute [an agreed-upon] business plan." Countercl. ¶ 36. We cannot say, at summary judgment and on the record before us, that the parties understood that Luitpold would necessarily be in breach of its best efforts obligation when it "deci[ded] to begin marketing GEM21S," *Luitpold III*, 2013 WL 1651624, at *10. And as a result, evidence that Luitpold made plans before September 2004 to market a competing product—the focus of the District Court's ruling—need not be treated as proof that Luitpold failed to exert its best efforts to promote Geistlich's products at that time. Indeed, other evidence in the record suggests that any actionable breach may have occurred much later. As Geistlich argues, record evidence indicates

that it was not until November 2005—when GEM21S received premarket approval from the Food and Drug Administration—that Luitpold actually launched GEM21S. Other record evidence suggests that Geistlich did not see a decline in its sales until mid–2006. Summary judgment in Luitpold's favor on Count III was improper.[6]

## CONCLUSION

For the reasons set forth above, the District Court erred in its dismissal of Counts IV and VI of the Complaint; erred in its grant of summary judgment to Defendants on Counts I, II, V, and VII of the Complaint; and erred in its grant of summary judgment to Luitpold on Counts II and III of Geistlich's counterclaims. In summary:

- *Count I, Requesting Declaratory Relief*: We vacate the judgment insofar as it granted summary judgment to Defendants, and remand for consideration of arguments on indefinite term and lost profits.

- *Count II, Alleging Repudiation of the Commercial Agreement and the 1994 License Agreement*: We vacate the judgment insofar as it granted· summary judgment to Defendants, and remand for consideration of arguments on indefinite term and lost profits.

- *Count IV, Alleging Breach of the Exclusive License Provisions of the 1994 License Agreement*: We vacate the judgment insofar as it granted Defendants' motion to dismiss. Count IV may proceed to· discovery, to the extent necessary, and then to summary judgment briefing and, if appropriate, to trial.

- *Count V, Alleging Repudiation of the 1998 License Agreement*: We vacate the judgment insofar as it granted summary judgment to Defendants, and remand for consideration of arguments on indefinite term and lost profits.

- *Count VI, Alleging Breach of the Exclusive License Provisions of the 1998 License Agreement*: We vacate the judgment insofar as it granted Defendants' motion to dismiss. Count VI may proceed to discovery, to the extent necessary, and then to summary judgment briefing and, if appropriate, to trial.

- *Count VII, Requesting Prejudgment Attachment of Patents and Trademarks*: We vacate the judgment insofar as it granted summary judgment to Defendants, and remand for consideration of arguments on indefinite term and lost profits.

- *Count II of the Counterclaims, Alleging Breach by Failure to Pay "Purchase Price:"* We vacate the judgment insofar as it granted summary judgment to Luitpold, and remand for consideration of Luitpold's arguments relating to Geistlich's damages expert.

- *Count III of the Counterclaims, Alleging Breach of "Best Efforts" Provision*: We vacate the judgment insofar as it granted summary judgment to Luitpold, and remand for consideration of Luitpold's arguments relating to Geistlich's damages expert.

Accordingly, we **VACATE** the judgment of the District Court and **REMAND** for

---

6. In supplemental briefing filed with the Court after this case was argued, Luitpold raises issues regarding Geistlich's damages expert as an alternative basis for affirmance with respect to Geistlich's counterclaims. We do not reach the question of damages in rendering our decision and thus leave it to the District Court, on remand, to consider these issues in the first instance.

further proceedings consistent with this opinion.