*Appaloosa Inv. L.P.I. v. Fed. Home Loan Mortg. Corp.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of July, two thousand twenty-two.

PRESENT:
> SUSAN L. CARNEY,
> RICHARD J. SULLIVAN,
> JOSEPH F. BIANCO,
> > *Circuit Judges.*

———————————————————————

APPALOOSA INVESTMENT L.P.I. and
PALOMINO MASTER LTD.,

> *Respondents-Appellants,*

v.                                                                 No. 20-1708

FEDERAL HOME LOAN MORTGAGE
CORPORATION, FEDERAL NATIONAL
MORTGAGE ASSOCIATION, and
CWCAPITAL ASSET MANAGEMENT
LLC,

> *Respondents-Appellees.*[*]

———————————————

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

FOR RESPONDENTS-
APPELLANTS:

THOMAS E. REDBURN, JR. (Lawrence M. Rolnick, Michael J. Hampson, Rolnick Kramer Sadighi LLP, New York, NY, *on the brief*), Lowenstein Sandler LLP, Roseland, NJ.

FOR RESPONDENTS-APPELLEES
FEDERAL HOME LOAN
MORTGAGE CORPORATION
AND FEDERAL NATIONAL
MORTGAGE ASSOCIATION:

CHRISTOPHER P. JOHNSON (Neil R. Lieberman, Prishika Raj, Holwell Shuster & Goldberg LLP, New York, NY; Scott L. Walker, Federal Home Loan Mortgage Corporation, McLean, VA, *on the brief*), McKool Smith, P.C., New York, NY.

FOR RESPONDENT-APPELLEE
CWCAPITAL ASSET
MANAGEMENT LLC:

GREGORY A. CROSS (Colleen Mallon Casse, *on the brief*), Venable LLP, Baltimore, MD.

Appeal from a judgment of the United States District Court for the Southern District of New York (Katherine Polk Failla, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART AND REVERSED IN PART**, and the case is **REMANDED** to the district court for further proceedings consistent with this order.

Appellants Appaloosa Investment L.P.I. and Palomino Master Ltd. (collectively, "Appaloosa") appeal from the district court's grant of summary judgment to Appellees Federal Home Loan Mortgage Corporation, Federal National Mortgage Association (collectively, the "Government-Sponsored Enterprises," or the "GSEs"), and CWCapital Asset Management ("CWC") in connection with the 2006 purchase of Peter Cooper Village and Stuyvesant Town (collectively, "Stuy Town") by Tishman Speyer Development Corp. ("Tishman Speyer") and its partner, BlackRock Realty Advisors, Inc. ("BlackRock"). To finance that purchase, Tishman Speyer and BlackRock borrowed $3 billion through a senior loan that was first split into six promissory notes and then sold to five commercial-mortgage-backed securities trusts. Interests in those trusts, called "certificates," were sold to investors. One such trust – the C30 Trust – was charged with administering the senior loan on behalf of the other trusts in accordance with the C30 Pooling and Servicing Agreement (the "C30 PSA"). In late 2009, because of the risk of an imminent default, administration of the senior loan was transferred from Wells Fargo Bank, N.A., the master servicer, to CWC for special servicing.

3

In January 2010, Tishman Speyer and BlackRock defaulted on the senior loan. When the default was not cured, CWC accelerated the senior loan and commenced foreclosure proceedings in the Southern District of New York. In June 2010, the district court entered a judgment of foreclosure and sale, authorizing the trusts to sell Stuy Town. But instead of selling the property, the trusts acquired title to Stuy Town through a deed in lieu of foreclosure, at which point Stuy Town became a real-estate-owned property ("REO Property") under the terms of the C30 PSA. Eventually, the trusts sold Stuy Town for $5.3 billion, which covered all of the unpaid principal and interest due at the time of the foreclosure judgment, leaving an excess of more than $1 billion.

The parties now dispute how those excess proceeds should be distributed. Under the C30 PSA, Appaloosa is entitled to a share of "Gain-on-Sale Proceeds," which the C30 PSA defines as liquidation proceeds net of any related liquidation expenses, minus the purchase price of the mortgage loan on the date on which such liquidation proceeds were received. C30 PSA § 1.01, *Gain-on-Sale Proceeds*, J. App'x at 371. Appaloosa contends that under the C30 PSA, Gain-on-Sale Proceeds include all the proceeds received in excess of the outstanding principal and interest, minus the costs of selling the property. For their part, the GSEs and

4

CWC contend that Gain-on-Sale Proceeds can be calculated only after the excess proceeds are used to pay "Yield Maintenance" and "Penalty Interest," which are defined terms in the C30 PSA. The parties also dispute whether interest on "Advances" – as defined in the C30 PSA ("Interest on Advances") – needs to be paid out of Penalty Interest or Gain-on-Sale Proceeds.

We review a district court's grant of summary judgment de novo. *Rosenberg v. MetLife, Inc.*, 493 F.3d 290, 291 (2d Cir. 2007). We assume the parties' familiarity with the facts, procedural history, and issues on appeal.

## DISCUSSION

### A.    Gain-on-Sale Proceeds

Under New York law, which governs the C30 PSA, *see* J. App'x at 624, written contracts are unambiguous when "the contract language has a definite and precise meaning," *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016). "If an ambiguity is found, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *In re Motors Liquidation Co.*, 943 F.3d 125, 131 (2d Cir. 2019) (internal quotation marks omitted). Thus, summary judgment should be granted either when "the evidence presented about the parties' intended

5

meaning is so one-sided that no reasonable person could decide the contrary" or when "the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 88 (2d Cir. 2015) (internal quotation marks omitted).

We agree with the district court that the C30 PSA does not unambiguously dictate how Gain-on-Sale Proceeds should be calculated. Appaloosa's proposed interpretation – that Gain-on-Sale Proceeds include all the funds received in excess of the outstanding principal and interest minus the costs of selling the property – would make several provisions of the C30 PSA superfluous, including key aspects of the proceeds-distribution structure known as the "waterfall" provision. This interpretation is therefore contrary to the basic principle of avoiding any construction "that would render a contractual provision without force and effect." *Id.* at 87. CWC's proposed interpretation – that Gain-on-Sale Proceeds can be calculated only after the excess proceeds are used to pay Yield Maintenance and Penalty Interest – is also flawed because the C30 PSA does not specify how Gain-on-Sale Proceeds should be prioritized relative to Yield Maintenance and Penalty Interest in the distribution of proceeds from the sale of an REO Property.

6

*See* C30 PSA § 1.01, *REO Loan*, J. App'x at 404–05. Unlike Appaloosa or CWC, the GSEs argue that the relevant provisions of the C30 PSA are ambiguous. Because we conclude that the C30 PSA is indeed ambiguous with respect to how Gain-on-Sale Proceeds should be calculated, we must turn to the extrinsic evidence submitted by the parties to determine the meaning of the term.[1] *See Motors Liquidation*, 943 F.3d at 131.

Under New York law, the parties' practical interpretation of a contract is "deemed of great, if not controlling, influence," and the parties' course of performance under the contract is the "most persuasive evidence of the[ir] agreed intention." *Fed. Ins. Co. v. Ams. Ins. Co.*, 691 N.Y.S.2d 508, 512 (1st Dep't 1999). The district court concluded that the parties' course of performance here "indisputably supports CWC's and the GSEs' view that Penalty Interest and Yield Maintenance are paid before Gain-on-Sale Proceeds." *Matter of Trusts Established*

---

[1] Appaloosa also argues that the Co-Lender Agreement, which controls in the event of a conflict between it and the C30 PSA, unambiguously prohibits CWC from collecting Penalty Interest. Despite conceding that the Co-Lender Agreement does not discuss Penalty Interest, Appaloosa nevertheless argues that the Co-Lender Agreement's silence should be construed to limit CWC's compensation to what is included in the Co-Lender Agreement. We do not interpret the Co-Lender Agreement's silence as a conflict with the C30 PSA that would unambiguously prohibit CWC from collecting Penalty Interest. *See Selective Ins. Co. of Am. v. County of Rensselaer*, 26 N.Y.3d 649, 657 (2016).

7

*Under Pooling & Servicing Agreements Relating to Wachovia Bank Com. Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series 2007-C30* (*In re Wachovia PSA Trusts*), No. 17-cv-1998 (KPF), 2020 WL 1304400, at *20 (S.D.N.Y. Mar. 19, 2020). We agree.

As the district court recounted, the data offered by CWC and the GSEs reveal that the contracting parties' historical manner of distributing REO Property proceeds is consistent with CWC's and the GSEs' proposed distribution here. *Id.* at *20–24. CWC's and the GSEs' proposed distribution is also consistent with how other special servicers in the industry have distributed proceeds from comparable sales of REO Properties. *Id.* at *24–30.

Appaloosa does not challenge the validity of this evidence. Rather, Appaloosa contends that, because it and other certificate holders "did not know about the transactions that . . . comprise the supposed course of performance," the parties' "clandestine" course of performance should not be considered. Appaloosa's Br. at 49–50. But what matters in ascertaining course of performance is the conduct of the parties to the contract. *See Fed. Ins.*, 691 N.Y.S.2d at 512. As a result, what the certificate holders – *third-party beneficiaries* under the C30 PSA – did or did not know is irrelevant to the *contracting parties'* intent when they drafted

8

the C30 PSA.   The district court therefore did not err in concluding that extrinsic evidence supports CWC's and the GSEs' position that Penalty Interest and Yield Maintenance must be paid prior to Gain-on-Sale Proceeds.

## B.    Interest on Advances

Appaloosa moved for partial summary judgment, arguing that CWC was required to use Penalty Interest to reimburse the C30 Trust for approximately $67.2 million in Interest on Advances.[2]   The district court denied that motion, concluding that "CWC was not required to reimburse [Interest on Advances] from the Penalty Interest it retained from the sale of Stuy Town" because Interest on Advances must be "satisfied before CWC retained Penalty Interest." *In re Wachovia PSA Trusts*, 2020 WL 1304400, at *44.   Here, the district court erred.

---

[2] Although the parties style the approximately $67.2 million as both "Interest on Advances" and "Additional Trust Fund Expenses," Appaloosa's Br. at 54; CWC's Br. at 51, the realized loss report explains that the $67.2 million comprises approximately $58.5 million in "Interest on Advances – P&I [Principal & Interest]," approximately $2.8 million in "Interest on Advances – T&I [Taxes & Insurance"], approximately $2.6 million in "Interest on Advances – Servicing Advances," and approximately $3.4 million in "Interest on Advances" categorized under "Additional Trust Fund Expenses," J. App'x at 5321.   For ease of reference, we refer to the $67.2 million solely as "Interest on Advances."

The C30 PSA's definition of REO Loan governs the distribution of proceeds collected on an REO Loan.[3]  *See* C30 PSA §§ 1.01, *REO Loan*, J. App'x at 404–05; 3.02(b), J. App'x at 440–41.   The definition requires the proceeds to be applied in four sequential steps:   "first, as a recovery of . . . Advances . . . ; second, as a recovery of accrued and unpaid interest on such REO Loan . . . ; third, as a recovery of principal of such REO Loan . . . ; and fourth, as a recovery of any other amounts due and owing in respect of such REO Loan, including . . . Penalty Interest and . . . *Additional Interest on other amounts, in that order.*"   *Id.* § 1.01, *REO Loan*, J. App'x at 404–05 (emphasis added).   Under this distribution structure, Interests on Advances do not fit into any of the first three steps and presumably would be paid last at the fourth step out of the general pool of sale proceeds.

But this is not the end of the inquiry.   The definition of REO Loan also provides that "amounts payable or reimbursable . . . in respect of the predecessor Mortgage Loan as of the date of the related REO Acquisition" are carved out of this distribution structure and are instead reimbursed based on the ordinary terms

---

[3]  The C30 PSA makes clear that the distribution here is governed by the REO waterfall provision set forth in the definition of "REO Loan" in section 1.01.   The general waterfall provision, section 3.02(b), directs that "amounts collected on any REO Loan shall be deemed to be applied in accordance with the definition thereof."   C30 PSA § 3.02(b), J. App'x at 440–41.   CWC's arguments to the contrary, in favor of applying the general waterfall provision, are unpersuasive.

of the C30 PSA under section 3.05(a). *Id*. Section 3.05(a), read in conjunction with the definition of REO Loan, provides that any Interest on Advances made on or before June 3, 2014 – the date of the transaction that made the senior loan an REO Loan (the "REO Acquisition") – is paid first out of late payment charges and Penalty Interest and then, to the extent that the late payment charges and Penalty Interest are insufficient, out of Gain-on-Sale Proceeds, *i.e.*, the catch-all category for any proceeds remaining for distribution after all the specified payments in the C30 PSA are made. *See id.* § 3.05(a)(ix), J. App'x at 452–53. Put simply, any portion of the $67.2 million attributable to Interest on Advances accruing *after* June 3, 2014 must be paid out of Gain-on-Sale Proceeds from the sale of Stuy Town; any portion attributable to Interest on Advances accruing *on or before* June 3, 2014 must be paid out of late payment charges and Penalty Interest.

It is true that no party advanced this interpretation in the district court or before us. But, in our view, this interpretation offers the correct and most coherent reading of the C30 PSA's provisions regarding the payment of Interest on Advances. We therefore reverse the district court's denial of Appaloosa's motion for partial summary judgment and the portion of the district court's order granting CWC summary judgment with respect to the proper manner of payment

11

of Interest on Advances. But because it is not clear on the record before us what portion of the $67.2 million in Interest on Advances accrued before the REO Acquisition and what portion accrued after the REO Acquisition, we remand the case to the district court to make that factual determination in the first instance.

## CONCLUSION

We have considered Appaloosa's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM IN PART AND REVERSE IN PART** the judgment of the district court, and we **REMAND** the case to the district court for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

12