State of New York v Oren-Pines (2024 NY Slip Op 50958(U))

[*1]

State of New York v Oren-Pines

2024 NY Slip Op 50958(U)

Decided on July 24, 2024

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 24, 2024
Supreme Court, Albany County

State of New York, Plaintiff,

against
Yaron Oren-Pines d/b/a IN COMMON, Defendant.

Index No. 906309-22 

Letitia James, Attorney General
Attorney for Plaintiff
(Denis R. Hurley Jr., of counsel)
The Capitol Albany, New York 12224
Solomon, Cramer & Summit LLP
Attorneys for Defendant
(Andrew T. Solomon, of counsel)
25 West 39th Street, 7th Floor New York, New York 10018

Richard M. Platkin, J.

Plaintiff State of New York ("State") commenced this action to recover monies paid to defendant Yaron Oren-Pines, doing business as In Common, pursuant to a contract to supply ventilators in the early days of the COVID-19 outbreak. Based on allegations that defendant breached the contract by failing to timely deliver the promised ventilators, the State seeks to recover $10 million, representing the balance of funds paid to defendant under the contract, together with a 22% collection fee under State Finance Law § 18.
Discovery is complete, and a trial-term Note of Issue has been filed (see NYSCEF Doc No. 61). Defendant now moves under CPLR 3212 for dismissal of the four remaining causes of action alleged in the State's complaint (see NYSCEF Doc No. 1 ["Complaint"]). The State opposes the motion and cross-moves for summary judgment on its Complaint.
BACKGROUND
A. The Parties' Business Dealings
In the early days of the COVID-19 outbreak, the State "sought to purchase hospital grade ventilators . . . for . . . treating seriously ill COVID-19 patients" (Complaint, ¶ 8). 
Defendant, working with an Israeli partner, Guy Peleg, had contacted the Federal Emergency Management Agency ("FEMA") to express an interest in supplying ventilators to the United States through a Chinese partner with access to a Chinese supplier (see NYSCEF Doc No. 65 ["Oren-Pines Aff."], ¶¶ 3-5). "FEMA did not end up purchasing the ventilators, but instead referred [defendant] to the State of New York," which led to him being "contacted by Jane Wiesenberg, from [the] New York Executive Chamber[], about acquiring ventilators for the State of New York's Department of Health" (id., ¶ 6).
On March 30, 2020, defendant sent the State an "Invoice," dated March 29, 2020, "for the purchase of 1,000 S1100A ICU ventilators-high acuity, 150 VG70 ICU ventilators-high acuity, and 300 Eternity SH300 ICU ventilators-high acuity, for the total sum of $86,377,500," plus shipping, handling and insurance, not to exceed $2,500,000 (Complaint, ¶ 14 & Ex. A ["Invoice"]; see Oren-Pines Aff., ¶ 7). The Invoice called for the State to immediately pay 80% of the purchase price and then pay the balance on delivery, which was to occur "within 7 Business Days and ASAP from verification of funds in checking account and assuming no unforeseen delays or delays outside of [defendant's] control." 
Later on March 30, 2020, the State wired $69,102,000, representing 80% of the total price requested in the Invoice, from its account at KeyBank N.A. ("KeyBank") to defendant's account at Wells Fargo Bank N.A. ("Wells Fargo") (see NYSCEF Doc No. 70; see also NYSCEF Doc No. 71, responses nos. 1 and 2).
Also on March 30, 2020, the State issued an initial Purchase Order to defendant (see NYSCEF Doc No. 72 ["initial Purchase Order"]). The initial Purchase Order mirrored the price and quantity terms of defendant's Invoice but stated different terms for payment and delivery. Under the initial Purchase Order, payment was "Net 30," and the "Due Date" for delivery was April 29, 2020 (id.). 
The initial Purchase Order also incorporated the terms and conditions of Appendix A, "Standard Clauses for New York State Contracts," and Appendix B, "Additional Standard Terms [*2](COVID-19 Related Transactions)" (id. & Complaint, Exs. C-D). Under the definition of "Contract" provided in the State's Appendix B, "[t]he terms and conditions included in any purchase orders or invoices shall not apply and shall not be deemed to be part of the Contract unless the [State] has specifically agreed to [them] in writing" (Appendix B, § 15.5).
Following issuance of the initial Purchase Order, a contract management specialist in the New York State Office of General Services ("OGS") sent an email inquiry to defendant regarding a delivery timetable for the ventilators (see NYSCEF Doc No. 73). Defendant replied that the initial Purchase Order establishes a "formal date of delivery of April 29, 2020," but he would go to "great measures" to deliver the ventilators "ASAP" (id.). 
Although defendant accepted the State's modified delivery date of April 29, 2020, he promptly objected to the "Net 30" payment term, advising that he needed an 80% upfront payment to acquire the ventilators (see NYSCEF Doc No. 74). The State responded on April 2, 2020 by issuing an amended Purchase Order that was identical to the initial Purchase Order in all respects other than the date of payment, which became "Due Now" (NYSCEF Doc No. 75 ["Purchase Order"]).
On April 1, 2020, defendant attempted to initiate a wire transfer of $10 million to his Chinese partner to secure ventilators (see NYSCEF Doc No. 76; Oren-Pines Aff., ¶ 14). However, the receiving bank, Bank of China, held up the transfer due to compliance concerns (see NYSCEF Doc No. 77; Oren-Pines Aff., ¶ 14). Defendant promptly advised State officials of the impediment and requested their assistance (see NYSCEF Doc Nos. 78-79). The Executive Chamber emailed Bank of China on April 3, 2020 (see NYSCEF Doc No. 80), and the $10 million was released shortly thereafter (see NYSCEF Doc No. 81; Oren-Pines Aff., ¶ 14.).
In his April 5, 2020 update to State officials, defendant confirmed Bank of China's release of the funds and assured the State that he and his venture partners had "utilized the unforeseen delay to sign legal documents with all companies and entities that [they] operate with" to "save . . . time later" (NYSCEF Doc No. 81). "New York did not dispute [defendant's] characterization of the delay as 'unforeseen" (Oren-Pines Aff., ¶ 15).
On April 6, 2020, Wells Fargo froze defendant's bank account due to fraud concerns (see id., ¶ 16; NYSCEF Doc No. 72 [response no. 8]). Defendant informed State officials of the issue, which was said to be "outside of [his] control" (NYSCEF Doc No. 83 [emphasis omitted]). While hopeful that the freeze would be lifted in a day or two, defendant did make State officials aware that the freeze was preventing him from wiring funds to his Israeli partner for the purchase of ventilators (see id.; Oren-Pines Aff., ¶ 17).
Wells Fargo's fraud concerns were raised by its cybercrime investigators, who feared the prospect of a scam or hacking incident (see NYSCEF Doc No. 84). But State officials knew full well that there had been no scam or hacking incident, that defendant was the intended recipient of the wired funds, and that defendant's plan to supply the State with ventilators contemplated the transfer of funds to an Israeli partner (see NYSCEF Doc No. 85 [April 6, 2020 email exchange]).
Nevertheless, by April 7, 2024, the State had arrived at an agreement or understanding with Wells Fargo by which the bank would "continue to hold the [wired] funds . . . pending confirmation from the State" (NYSCEF Doc No. 86). In this connection, defendant submits proof that Wells Fargo telephoned the New York State Treasurer at 10:00 a.m. on April 7, 2020 to give the State "30 minutes to verify the In Common transaction or they will green light [*3][defendant's] $57M wire to Israel" (NYSCEF Doc No. 88). However, by 5:00 p.m. the same day, Wells Fargo took the position that it would "continue to hold the funds . . . pending confirmation from the State" (NYSCEF Doc No. 86). Still, the State Treasurer testified in his deposition that "any concern that Wells Fargo had with respect to whether the wire had in fact been authorized, or whether emails had been compromised . . . had all been addressed and dispelled at that point" (NYSCEF Doc No. 89 at 107).
Although the State was aware that defendant needed the wired funds to secure ventilators (see NYSCEF Doc Nos. 83, 91), State officials refused to confirm the transfer until defendant arranged an inspection in China of the ventilators purchased (or secured) with the $10 million from Bank of China (see NYSCEF Doc No. 92 [April 8, 2020 email]). However, "because of the complexities involved in doing business in China, its restrictive policies, and the rapid movement of available ventilator supplies globally, [defendant was] unable to coordinate a successful inspection" (Oren-Pines Aff., ¶ 19).
By April 9, 2020, the State had determined that it should not be "pursuing any new leads" for ventilators and, instead, should be "wrapping up existing contracts with an eye toward bringing in vents that we can get in short order and terminating contracts where we can" (NYSCEF Doc No. 93).
Defendant's Israeli partner, Guy Peleg, notified State officials on April 9, 2020 that the State's failure or refusal to confirm the wire transfer to Wells Fargo constituted a breach of the Contract (see NYSCEF Doc No. 94). "Be advised that all delays accumulated in clearing funds will be added to the delivery due date, which is stated in PO as April 29th, 2020" (id.). 
In its response, the State observed that it was Wells Fargo that froze the funds (see id.). The State also raised concerns about defendant's inability to arrange an immediate inspection of the ventilators in China, and it informed defendant that the wire transfer would not be confirmed unless defendant could "successfully deliver ventilators to New York purchased with the $10 million" (id.). 
After an April 10, 2020 email update from defendant, a high-ranking State official told colleagues that she "really want[s] to shut this down" (NYSCEF Doc No. 95). Nonetheless, the State official declined to take any immediate action because she wanted to salvage value from the $10 million that had already been transferred to China pursuant to the Contract (see NYSCEF Doc No. 96 ["Mogul EBT"] at 161-162).
Defendant eventually agreed to procure $10 million of ventilators for the State (see NYSCEF Doc No. 97). Meanwhile, defendant's Contract appeared on a spreadsheet of ventilator contracts "target[ed] for cancelling" by the State (NYSCEF Doc No. 98). Notably, the State's spreadsheet indicates an "Expected Delivery" date of "Week of April 27" for defendant's ventilators (id.).
The State continued to negotiate for a partial delivery of ventilators, but those negotiations eventually broke down when defendant requested additional money to cover the increased costs associated with the modified transaction (see Mogul EBT at 180-181; Oren-Pines Aff., ¶ 24). 
The State then demanded that defendant cancel the Contract and return the balance of wired funds, which remained frozen by Wells Fargo, but the parties were unable to agree on terms (see id.). On April 20, 2020, the State issued a formal notice of cancellation to defendant's [*4]counsel, which read as follows:
In accordance with Section 9 of Appendix B, which is referenced in and made a part of the above-referenced Purchase Order, this letter provides written notice that the New York State Department of Health is hereby terminating the Purchase Order.
Please advise your client, Yaron Oren-Pines, to immediately cease all activity in connection with the above-referenced Purchase Order. Thank you for your attention to this matter (Complaint, Ex. E).
On April 21, 2020, the State directed KeyBank to issue a wire recall request to Wells Fargo in the amount of $69,102,000 (see NYSCEF Doc No. 99; NYSCEF Doc No. 71, response no. 11). Wells Fargo agreed to the cancellation on April 22, 2020, wiring $59,102,000 from defendant's account to the State's account (see NYSCEF Doc No. 71, response no. 12). 
Through an August 22, 2020 email to defendant's counsel, the State demanded repayment of the outstanding Contract balance of $10 million (see Complaint, ¶ 34 & Ex. F), but the funds were not returned (see Complaint, ¶ 35). 
B. Procedural History
The State commenced this action on August 24, 2022, seeking to recover $10 million under theories sounding in breach of contract, unjust enrichment, misappropriation of public funds, and monies had and received (see id., ¶¶ 36-51). The State also seeks a 22% collection fee under State Finance Law § 18 (see id., ¶¶ 52-54). 
In lieu of answering, defendant moved to dismiss the Complaint for failing to state a claim upon which relief may be granted. In an Amended Decision & Order dated March 28, 2020 (see NYSCEF Doc No. 28 ["MTD Decision"]), the Court denied defendant's motion, except to the extent of dismissing the misappropriation claim (see id. at 13-14, 16).
In addition to this action, there are at least three other related matters: (i) defendant's claims against Wells Fargo, which are being arbitrated in California; (ii) defendant's claims against KeyBank, which are the subject of an action in this Court that has been stayed pending resolution of the Wells Fargo arbitration (see Index No. 910615-23, NYSCEF Doc No. 21); and (iii) a new action by the State claiming that defendant would be unjustly enriched by the recovery of $59,102,000 from Wells Fargo in the California arbitration (see Index No. 905965-24, NYSCEF Doc No. 1).
Discovery in this action is complete, and the State filed a trial-term Note of Issue and Certificate of Readiness on March 6, 2024 (see NYSCEF Doc No. 61). Defendant now moves under CPLR 3212 for the summary dismissal of the State's Complaint. The State opposes the motion and cross-moves for summary judgment as to liability and damages.
SUMMARY JUDGMENT STANDARD
"To prevail on a motion for summary judgment, the moving party must establish prima facie entitlement to judgment as a matter of law by adducing sufficient competent evidence to show that there are no issues of material fact" (Staunton v Brooks, 129 AD3d 1371, 1372 [3d Dept 2015] [citations omitted]; see Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). 
If the movant fails to satisfy this initial burden, the motion must be denied, "regardless of the sufficiency of the opposing papers" (Alvarez, 68 NY2d at 324). But if the movant establishes a prima facie case, the burden shifts to the nonmoving party to demonstrate that material issues [*5]of fact or legal defenses to the claims exist (see id.; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). All evidence must be viewed in the light most favorable to the opponent of summary judgment (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]). 
BREACH OF CONTRACT
The elements of a claim for breach of contract are "the existence of a contract, the party's own performance under the contract, the other party's breach of its contractual obligations, and damages resulting from the breach" (Adirondack Classic Design, Inc. v Farrell, 182 AD3d 809, 811 [3d Dept 2020] [citations omitted]). 
A. Contract Formation Issues
1. Appendix B
The State maintains that the contract with defendant for the purchase of ventilators ("Contract") consisted of the Invoice, Purchase Order and Appendices A and B (see Complaint, ¶¶ 14-18; NYSCEF Doc No. 105 ["State Opp"] at 2-3).
Defendant assumes for purposes of his motion that Appendix B, which provides the State a right to terminate for convenience, is part of the Contract (see NYSCEF Doc No. 102 ["MOL"] at 2). However, defendant disputes the State's contention that the exchange of forms between the parties resulted in Appendix B becoming part of the Contract; according to defendant, the State will have to prove at trial that he accepted Appendix B to justify a termination for convenience (see id. at 12 n 3).
The parties agree that the Invoice was an offer to contract for the sale of goods. Under article 2 of the Uniform Commercial Code ("UCC"), an offer "shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances" (UCC 2-206 [1] [a]). "A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms" (UCC 2-207 [1]).
The Purchase Order mirrors the Invoice as to the quantity, type, price and shipping terms, but states different payment and delivery terms. Under the Purchase Order, as amended, payment was "Due Now," and the "Due Date" became April 29, 2020. The Purchase Order also "states terms additional to or different from those offered" by defendant in the Invoice through the incorporation of Appendices A and B.
The State's inclusion of additional or different terms in the Purchase Order did not preclude it from "operat[ing] as an acceptance" (UCC 2-207 [1]; see MTD Decision at 8).[FN1]
"The additional terms are to be construed as proposals for addition to the contract," and ordinarily become part of a contract for the sale of goods between "merchants" unless the terms "materially alter" the offer or the offeror timely objects (UCC 2-207 [2] [a-c]). As between nonmerchants, the additional terms "'will not be included unless expressly agreed to by the other party'" (Matter of Doughboy Ind. [Pantasote Co.], 17 AD2d 216, 222 [1st Dept 1961], quoting UCC 2-207, Comment 3; see also UCC 2-207 [3] ["Conduct by both parties which recognizes the existence [*6]of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract."]).[FN2]

The State's argument that Appendix B is part of the Contract is based primarily on defendant's testimony (see State Opp at 2-4). The State cites defendant's admissions that: (i) the "April 2 Purchase Order incorporated by reference [Appendices A and B]" (NYSCEF Doc No. 31, ¶ 17); (ii) defendant was provided with a copy of Appendix B on March 30, 2020, and another copy was sent a few days later at his request (see NYSCEF Doc No. 106 at 63-68); and (iii) defendant understood that the Contract included Appendix B, and he intended to perform in accordance with Appendix B (see id.). In response, defendant merely asserts that there is "no evidence that [he] ever agreed to Appendix B" (NYSCEF Doc No. 120, ¶ 29).
The Court is satisfied that defendant agreed to Appendix B through his words and conduct (see Please Me, LLC v State of New York, 215 AD3d 1149, 1151 [3d Dept 2023]). Defendant received the State's Purchase Order purporting to incorporate Appendix B; defendant understood that Appendix B would be part of the Contract; defendant intended to perform in accordance with Appendix B; defendant proceeded to accept the State's performance (i.e. the transfer of funds) and tender his own performance (i.e. wiring funds to his Chinese partner) with that understanding of the Contract; and defendant and his partners affirmatively invoked the provisions of Appendix B in their dealings with State officials (see NYSCEF Doc No. 94 at 2, ¶ 6).
2. Delivery Date
The State contends that the Contract required defendant to deliver ventilators within seven business days of payment (see Complaint, ¶¶ 18-19; State Opp at 7), relying on the language within the Invoice calling for "[d]elivery within 7 Business Days and ASAP from verification of funds in checking account and assuming no unforeseen delays or delays outside of [defendant's] control." Defendant maintains that the Contract established an April 29, 2020 delivery date, as reflected in the State's Purchase Order (see MOL at 12).
As stated above, the Invoice was an offer to contract by defendant, and the Purchase Order was the State's acceptance. Regarding delivery, defendant proposed "[d]elivery within 7 Business Days and ASAP from verification of funds in checking account and assuming no unforeseen delays or delays outside of [defendant's] control" (Invoice), and the State countered with a delivery date of April 29, 2020 (Purchase Order).
Under UCC 2-207 (2), the State's inclusion of a different delivery term in its acceptance operated as a proposal, which defendant promptly accepted through his words and conduct. Thus, on April 1, 2020, immediately following issuance of the initial Purchase Order, defendant responded to a "delivery status" inquiry from the State by advising that the Contract established a "formal date of delivery [of] April 29, 2020" (NYSCEF Doc No. 73; cf. NYSCEF Doc No. 74 [objecting to revised payment term of initial Purchase Order]). 
Defendant and his partners continued to rely on the April 29, 2020 delivery date in their communications with State officials (see NYSCEF Doc No. 94), and State officials never [*7]disputed the April 29, 2020 delivery date (see id.). In fact, when defendant's Contract was "target[ed] for cancelling" on or about April 15, 2020 (NYSCEF Doc No. 98), State officials were expecting delivery the "Week of April 27" (id.).
This is consistent with the State's own definition of the term "Contract," which declares that "[t]he terms and conditions included in any purchase orders or invoices shall not apply and shall not be deemed to be part of the Contract unless the [State] has specifically agreed to such terms and conditions in writing" (Appendix B, § 15.5). The State has not adduced any writing by which it agreed to the delivery schedule proposed in the Invoice; to the contrary, the Purchase Order and all subsequent writings refer exclusively to a delivery date of April 29, 2020.
The Court therefore concludes that the April 29, 2020 delivery date established in the Purchase Order is controlling.[FN3]

B. Defendant's Alleged Breaches
On April 20, 2020, the State terminated the Contract for convenience pursuant to the authority of section 9 of Appendix B (see Complaint, Ex. E ["Notice of Termination"]).
"Generally, '[w]hen a contract is terminated, . . . the rights and obligations thereunder cease'" (International Tech. Mktg., Inc. v Verint Sys., Ltd., 157 F Supp 3d 352, 363 [SD NY 2016], affd 850 Fed Appx 38 [2d Cir 2021], quoting Twitchell v Town of Pittsford, 106 AD2d 903, 904 [4th Dept 1984], affd 66 NY2d 824 [1985]). This principle is reflected in UCC 2-106 (3), which provides that, upon termination of a contract for the sale of goods, "all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives." Consistent with this framework, the State's Notice of Termination, issued on April 20, 2020, directed defendant "to immediately cease all activity [under] the [Contract]."
Given that the State terminated the Contract for convenience nine days prior to defendant's April 29, 2020 delivery deadline, the State cannot establish its claim for breach of contract through its pleaded allegations that defendant "fail[ed] to [timely] deliver 1,000 S1100A ICU ventilators-high acuity, 150 VG70 ICU ventilators-high acuity, and 300 Eternity SH300 ICU ventilators-high acuity" (Complaint, ¶ 37). To prevail, the State must demonstrate a pre-termination breach of the Contract under some unpleaded theory of recovery.[FN4]

[*8]1. Defendant's April 2, 2020 and April 7, 2020 Emails
The State argues principally that defendant materially breached the Contract through an April 2, 2020 email "making clear that he would be unable to perform as required by the Contract due to the Chinese government's ban on the export of medical equipment to the United States" (State Opp at 5). Defendant allegedly breached the Contract again on April 7, 2020 through an email that "demonstrate[ed] his inability to perform as required" and by attempting "to convince [the State] to allow for a material deviation from the Contract's terms" (id. at 6).
The April 2, 2020 email requested the assistance of State officials to facilitate Bank of China's release of $10 million to defendant's Chinese partner (see NYSCEF Doc No. 111). The email indicated that defendant had been informed by his partner that China was unwilling to release medical equipment and ventilators for shipment to the United States due to "some type of Political related issue" (id.). The State argues that defendant's email shows that he "was immediately unable to perform according to the terms of the Contract, and thus, breached the Contract on April 2, 2020" (State Opp at 5).
The April 7, 2020 email advised State officials that "[t]he situation in China is such that we need to reserve whatever stocks we can find" (NYSCEF Doc No. 112). Defendant therefore "request[ed] the flexibility to substitute" available devices "against other devices promised," and he sought the State's consent to "confirm that [they] accept [the new] arrangement" (id.). According to the State, the April 7, 2020 email not only demonstrated defendant's "inability to perform as required by the Contract," but also was "an effort by [d]efendant to convince [the State] to allow for a material deviation" (State Opp at 6).
There is no merit to the State's contention that defendant's emails constituted breaches of the Contract. Even if the emails called into question defendant's ability to deliver the ventilators, the emails were sent well in advance of the contractual delivery date of April 29, 2020.[FN5]
"It is well-settled law that a contract is not breached until the time set for performance has expired" (Rachmani Corp. v 9 E. 96th St. Apt. Corp., 211 AD2d 262, 265 [1st Dept 1995]). And the State has not identified any other contractual duty that defendant could have breached on April 2, 2020 or April 7, 2020 through the emails. Accordingly, the State's claim that the emails constituted a total breach of the Contract is viable, if at all, only under a theory of anticipatory breach.
"An anticipatory breach of contract by a promisor is a repudiation of [a] contractual duty before the time fixed in the contract for . . . performance has arrived" (Princes Point LLC v Muss Dev. L.L.C., 30 NY3d 127, 133 [2017] [internal quotation marks and citation omitted]). The anticipatory breach "can be either a statement . . . indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach" (id. [internal quotation marks and citation omitted]). "A claim of anticipatory repudiation must be supported by evidence of an unqualified and clear refusal to perform with respect to the entire contract" (Joseph P. Carrara & Sons, Inc. v A.R. Mack Constr. Co., Inc., 89 AD3d 1190, 1191 [3d Dept 2011] [citations omitted]; see Princes Point, 30 NY3d at 133; [*9]Children of Am. [Cortlandt Manor], LLC v Pike Plaza Assoc., LLC, 113 AD3d 583, 585 [2d Dept 2014]), and, if established, "entitles the nonrepudiating party to claim damages for total breach" (Long Is. R.R. Co. v Northville Indus. Corp., 41 NY2d 455, 463 [1977]).
The April 2, 2020 email advised State officials of an unforeseen "[p]olitical" impediment to defendant's performance and requested the State's "help in escalating this matter" (NYSCEF Doc No. 111). But a "[m]ere expression of difficulty in tendering the required performance . . . is not tantamount to a renunciation of the contract" (Rachmani Corp., 211 AD2d at 267). The email did not in any way indicate that defendant was unwilling or unable to perform. To the contrary, defendant wrote to secure "[g]overnment intervention" to resolve an apparent "[p]olitical" problem that posed a threat to the delivery of urgently-needed ventilators.[FN6]
And with the assistance of State officials (see NYSCEF Doc No. 80), the $10 million promptly was released on April 5, 2020 (see NYSCEF Doc No. 81). 
Similarly, in defendant's April 7, 2020 email, he simply reported his understanding of current market conditions in China at a time of global uncertainty, and the email took the form of a proposal to modify the terms of the Contract to reflect changing conditions. But defendant did not condition his performance under the Contract on the State's acceptance of his proposal; he affirmatively requested the State's assent to the proposed modification (see O'Connor v Sleasman, 37 AD3d 954, 956 [3d Dept 2007] ["proposal of . . . terms that go beyond the contract is not a repudiation . . . unless it is coupled with a threat of nonperformance if those terms are not accepted" (internal quotation marks and citation omitted)], lv denied 9 NY3d 806 [2007]). Nor could the April 7, 2020 email reasonably be understood as a declaration that it would be impossible for defendant to deliver the ventilators unless the State granted him additional "flexibility to substitute" (NYSCEF Doc No. 112). As such, defendant's April 7, 2020 proposal to modify the Contract was not a clear and unqualified refusal to perform or a statement that performance was impossible. 
Accordingly, the Court concludes that neither defendant's April 2, 2020 nor April 7, 2020 emails can be deemed an anticipatory repudiation of the Contract. 
In any event, even if the emails could be viewed as an anticipatory breach, the State's claim of breach would be foreclosed by election-of-remedies principles. When confronted with defendant's alleged repudiation, the State had two options: "either (1) treat the [repudiation] as an anticipatory breach, consider the [Contract] at an end and seek damages, or (2) ignore the anticipatory breach, continue to perform the [Contract], wait to see if [defendant] would perform when required by the terms of the [Contract] and, if it did not do so, then bring suit on the subsequent breach" (AG Props. of Kingston, LLC v Besicorp-Empire Dev. Co., LLC, 14 AD3d 971, 973 [3d Dept 2005]). "In determining which election the nonbreaching party has made, the operative factor is whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that it had made an election" (AG Props., 14 AD3d at 973 [internal quotation marks and alterations omitted]).
The State did not elect to treat the April 2, 2020 email as an anticipatory repudiation, and it did not consider the Contract to be broken on account of defendant's email. Rather, State [*10]officials responded to the email by providing the assistance requested by defendant, thereby facilitating Bank of China's release of $10 million to defendant's partner on April 5, 2020.[FN7]
Having elected to ignore the alleged repudiation and continued to perform under the Contract, the State cannot now renounce its election and declare defendant in total breach as of April 2, 2020 (see V.S. Intern., S.A. v Boyden World Corp., 862 F Supp 1188, 1196 [SD NY 1994]). 
The same is true of the April 7, 2020 email. State officials did not respond to the email as a repudiation or consider the Contract to be at an end on account of the email (see e.g. NYSCEF Doc Nos. 92, 94, 125).
The Court therefore concludes that the April 2, 2020 and April 7, 2020 emails are insufficient to establish an anticipatory breach of contract or to raise a triable issue of fact.
2. Inspections
In its motion papers, the State argues in passing that defendant's failure to allow a pre-shipment inspection of ventilators in China "constitutes an additional breach of the Contract" (State Opp at 8). According to the State, defendant "was paid $10 million for ventilators and [the State] had an unfettered right to inspect them pursuant to [section 4 of] Appendix B" (id. at 7-8). 
As an initial matter, no ventilators had been shipped, delivered or received at the time of the State's inspection request, and there remained ample time for the State "to inspect each Product prior to each shipment and delivery and/or after receipt of each Product" (Appendix B, § 4). Thus, the State has not established that defendant's time for performance of the inspection obligation had expired at the time of the alleged breach, thus foreclosing the claim.
And even if the State could establish a breach of the inspection requirement, election-of-remedies principles would foreclose the State's belated attempt to treat the entire Contract as broken. "When a party materially breaches a contract, the nonbreaching party must choose between two remedies: it can elect to terminate the contract or continue it" (Awards.com v Kinko's, Inc., 42 AD3d 178, 188 [1st Dept 2007], affd 14 NY3d 791 [2010]; see Strasbourger v Leerburger, 233 NY 55, 59 [1922] [contracting party cannot "at the same time treat the contract as broken and as subsisting"]). 
"But New York law does not treat as inconsistent the right to continue to perform and to accept performance under a contract (on the one hand) and the right to sue for damages based on a breach (on the other)" (Luitpold Pharm., Inc. v Ed. Geistlich Sohne A.G. Fur Chemische Industrie, 784 F3d 78, 97 [2d Cir 2015]). "A party to an agreement who believes it has been breached may elect to continue to perform the agreement and give notice [of the breach] to the other side rather than terminate it" (Capital Med. Sys. v Fuji Med. Sys., U.S.A., 239 AD2d 743, 746 [3d Dept 1997]). Where such an election is made, "the nonbreaching party does not waive the right to sue for the alleged breach" (Albany Med. Coll. v Lobel, 296 AD2d 701, 702 [3d Dept 2002]).
The State did not inform defendant that it deemed his inability to provide a pre-shipment inspection of ventilators in China to be a material breach of the Contract, and it did not thereafter treat the Contract as broken. Instead, State officials informed defendant that if he "successfully deliver[ed] ventilators . . . purchased with the $10 million . . . , [the State] will continue to work [*11]with [him] to acquire the remaining ventilators covered by the purchase order. If [defendant was] unable to do so in short order, [the State] will. . . terminate the contract" (NYSCEF Doc No. 94 [emphasis added]; see UCC 2-609 [establishing procedures for purchaser to obtain adequate assurances]). And the State did not elect to terminate the Contract until April 20, 2020, eleven (11) days later, and the basis for the termination was the State's convenience, not cause (see Complaint, ¶¶ 24-32 & Ex. E).
The Court therefore concludes that election-of-remedies principles bar the State from maintaining a claim of total breach based on the lack of pre-shipment inspections. And even if the State preserved its right to sue for partial breach, it has not articulated any plausible basis to conclude that the loss it seeks to recover was caused by a breach of the inspection obligation.
Based on the foregoing, the Court concludes that the State has not raised a triable issue of fact as to its unpleaded claim that defendant breached the Contract by failing to allow pre-shipment inspections of the ventilators in China.
QUASI-CONTRACTUAL CLAIMS
The State also seeks recovery of the $10 million under theories sounding in unjust enrichment and monies had and received.
"A cause of action for unjust enrichment requires a showing that (1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) that it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff" (Clifford R. Gray, Inc. v LeChase Constr. Servs., LLC, 31 AD3d 983, 987-988 [3d Dept 2006] [citations omitted]). "The essence of such a cause of action is that one party is in possession of money or property that rightly belongs to another" (id. [citations omitted]).
Likewise, monies had and received "is an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience [it] ought not to retain and that belongs to another" (Parsa v State of New York, 64 NY2d 143, 148 [1984]).
There is no dispute as to the existence of the Contract or its applicability to the State's claim to recover the outstanding balance of funds paid to defendant under the Contract. Contrary to the State's argument, the parties' contract-formation disputes regarding Appendix B and the delivery date do not demonstrate a bona fide dispute as to "'the application of"' the Contract (State Opp at 13-14, quoting Goldman v Simon Prop. Group, Inc., 58 AD3d 208, 220 [2d Dept 2008] [emphasis omitted]). In this context, "application" refers to whether the contract, properly construed, encompasses the dispute at hand (see Goldman, 58 AD3d at 220, citing Hochman v LaRea, 14 AD3d 653, 654-655 [2d Dept 2005] ["where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quasi-contract"]). 
As the subject matter of the State's claim is governed by a valid and enforceable Contract, there can be no quasi-contractual claims arising from the same subject matter (see IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 142 [2009]; Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 388-389 [1987]). 
And even if the State could pursue quasi-contractual recovery, it has not adduced any evidence that defendant is in possession of the $10 million it seeks to recover. Nor is there evidence of any other benefit or property that defendant derived from such funds. The record shows that $10 million was wired to Bank of China and transferred to defendant's Chinese supplier, but there is no evidence that defendant was in any way enriched by that transfer, [*12]received a profit or benefit therefrom, or is in possession of any money or property capable of disgorgement (cf. Fountoukis v Geringer, 33 AD3d 756, 757 [2d Dept 2006] [transfer to third party reduced defendant's indebtedness]; see also MTD Decision at 13 [inviting the State to engage in discovery on this issue]). Under the circumstances, the State cannot establish that it "would be inequitable to permit the defendant to retain that which" the State sues to recover (Clifford R. Gray, 31 AD3d at 988 [emphasis added]). 
CONCLUSION
Based on the foregoing,[FN8]
it is
ORDERED that defendant's motion for summary judgment is granted; and it is further
ORDERED that plaintiff's cross motion is denied; and finally it is
ORDERED that plaintiff's complaint is dismissed in all respects.
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for defendant shall promptly serve notice of entry on all parties entitled to such notice.
Dated: July 24, 2024
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 64-127.

Footnotes

Footnote 1:Neither side contends that the State's acceptance was "expressly made conditional on assent to the additional or different terms" (UCC 2-207 [1]; see MTD Decision at 8-9).

Footnote 2:The State does not argue that the Contract was between merchants or that Appendix B did not "materially alter it" (UCC 2-207 [2] [b]).

Footnote 3:In view of this conclusion, the Court need not delve into the extent to which the "7 Business Days" deadline was tolled due to "unforeseen delays or delays outside of [defendant's] control" (Invoice), including the temporary hold placed by Bank of China and the never-relieved delay caused by the Wells Fargo freeze and the State's refusal to confirm the wire transfer.

Footnote 4:Although disfavored, a plaintiff may oppose a motion for summary judgment on the basis of an unpleaded cause of action supported by the record (see Comsewogue Union Free School Dist. v Allied-Trent Roofing Sys., Inc., 15 AD3d 523, 524 [2d Dept 2005]). Indeed, a court may go so far as to grant plaintiff summary judgment on such a cause of action "if the opposing party has not been misled to its prejudice" (Rubenstein v Rosenthal, 140 AD2d 156, 158 [1st Dept 1988]; accord Boyle v Marsh & McLennan Cos., Inc., 50 AD3d 1587, 1588 [4th Dept 2008], lv denied 11 NY3d 705 [2008]; Stiber v Cotrone, 153 AD2d 1006, 1007 [3d Dept 1989], lv denied 75 NY2d 703 [1990]).

Footnote 5:Even if delivery were required in "7 Business Days" and there were no tolling due to "unforeseen delays or delays outside of [defendant's] control" (Invoice), both alleged breaches preceded the April 9, 2020 delivery date argued for by the State (see State Opp at 5).

Footnote 6:As properly observed by defendant, the Contract did not oblige him to source ventilators from China.

Footnote 7:Thus, the $10 million loss sued upon by the State was in no way caused by defendant's email of April 2, 2020 advising of the temporary freeze.

Footnote 8:The State's claim under State Finance Law § 18 is not an independent cause of action; it is contingent upon the State's recovery of $10 million under one of the theories rejected above (see New York State Thruway Auth. v Allied Waste Services of N. Am., LLC, 143 AD3d 1145, 1146-1147 [3d Dept 2016]; cf. Commissioners of State Ins. Fund v Hallmark Operating, Inc., 61 AD3d 1212, 1213-1214 [3d Dept 2009]). As such, this claim fails as well.